HENDRICKS VS. JOHNSON.

1. Parties aggrieved by the determination of the County court, in proceedings under the statute of eighteen hundred and twelve, entitled " an act to amend an act, entitled an act to encourage the building of public mills, and directing the duties of millers;"* and taking an appeal to the Circuit court, must do so in term time, and the evidence taken, if certified by the judge, in the absence of a bill of exceptions, will be presumed to be all the evidence acted on by the County court, and any other evidence must be presented by bill of exceptions.

2. A trial *de novo* on an appeal, can never be had in the Circuit court, unless the statute giving the right of appeal expressly directs such a course to be pursued, and after the removal of a case by appeal from the County to the Circuit court, errors must be assigned as in other cases—and there is no need of making the number of assignments of error equal the number of facts involved.

3. The right to the use of the waters of a stream, is common to all the owners of adjacent lands, and is incidental to the possession of the lands, and a severance of the right can only be had by consent of those interested,—and the United States have no other rights, as the owners of lands, than is common to land-holders in the State, and when they grant a part of their domain, only such rights as are incidental to the land, pass to the purchaser.

4. By the common law, all proprietors of lands have the same rights to waters flowing through their domains, and one cannot be permitted so to use them as to annoy those above or below him, and successive actions lie in favor of those injured

---

* Aik. Dig. 324.

by impediments placed in the stream, against the wrongdoer to effect their removal.

5. The act of eighteen hundred and twelve aforesaid, does not contemplate the exercise of any discretion by the County court, in proceedings under a writ of *ad quod damnum*, and if none of the injuries named in the statute are likely to ensue, the application for the erection of a mill or mills must be granted: if otherwise, the application must be rejected. The statute does not provide for the determination of conflicting claims, in relation to the appropriation under the statute, of the same water power.

6. The first applicant for the benefit of the writ under the act, acquires an inchoate right to the privileges conferred by the statute, and if he proceeds in the case 'with reasonable diligence, he is entitled to a decree establishing his mill. Adverse rights are to be compensated by damages assessed by the jury of inquest.

7. A land proprietor, who apprehends injury from the contemplated erection of a mill, may, by propounding his interest, litigate questions with an applicant in the County court, at any time before a final decree.

8. The applicant for the privileges of the writ of *ad quod damnum*, must conform in all things to the judgment of the court granting his application, or rely upon his common law rights,—and if he do not conform to the judgment of the competent tribunals, or anticipates their favorable determination, and by erecting his mill, causes injury to others :—those injured are entitled to all the common law remedies against him.

9. Where two records or papers, which are *quasi* records, are made or issued on the same day, parol evidence is admissible to shew which of the two was prior in point of time. It is the duty of the clerk of the County court, to issue writs *ad*

6p. 53

*quod damnum*, and an error of the clerk, cannot have the effect to prejudice the right of a party suing out such a writ, and if such a writ issued under the act of eighteen hundred and twelve, be quashed for the reason that a blank was left in the same when issued, the party making the application, will not be prevented from suing out a new writ in any reasonable time after the first writ is quashed, supported by his first application.

10. It is wholly unnecessary to insert any day, in a writ of *ad quod damnum*, for holding the inquest, when the application is made by one owning lands on both sides of a water course, and when the application does not seek for the condemnation of lands belonging to others for an abutment, ditch or canal. The only reason why a day, in such cases as seek a condemnation, is required to be inserted, is, that the sheriff is required to give notice to the proprietors of the lands sought to be condemned ten days before the time at which the inquest is to be held.

11. Where one begins the erection of a mill, and completes it, after the application of another to the County court for the writ of *ad quod damnum*, and for the purpose of defeating the right acquired by the application, he is entitled to no commiseration if his mill be overflowed, and to no redress against the party who was proceeding lawfully to obtain a confirmation and establishment of his mill.

12. A plea in abatement cannot be sustained to a writ of *ad quod damnum*, sued out under the act of eighteen hundred and twelve aforesaid,—it is wholly an *ex parte* proceeding until the return of the inquisition, when any one interested in the subject matter, may appear with or without process served on him, and contest the claim of the applicant.

13. Where defects appear in the writ or inquisition, they may be reached by a motion to quash the same, and if so disposed of, other process could then be awarded, and on its return, the cause proceed to final judgment, from which an appeal can be taken by any one previously a party before the court.

Error to the Circuit court of Dallas county.

Proceedings under the "act to amend an act entitled an act to encourage the building of public mills, and directing the duties of millers,"—approved December the fourteenth, eighteen hundred and twelve.

On the twenty-second day of November, eighteen hundred and thirty-three, William Hendricks sued out of the clerk's office of the County court of Dallas county, a writ of *ad quod damnum*, which writ commanded the sheriff of said county to summon and empannel seven freeholders or landholders, to meet on the twenty-ninth day of November, following, upon a certain tract of land, known as section thirty-three, in township fifteen, range nine, in said county, the property of William Hendricks, as he averred; upon which land on a creek or stream commonly called Johnson's mill creek, on both sides of which creek said Hendricks claimed to have the property in the lands, and at which place he proposed to erect a dam across the said creek or stream, and to build a water grist-mill and saw-mill or mills. The sheriff was further commanded, that when the freeholders or landholders had met and were empanneled, he should charge them impartially and to the best of their skill and judgment, to view the land upon which it was so proposed to erect a dam and build a mill or mills as aforesaid, having due regard therein to the interests of all persons, and to examine the lands above and below, if the property of others, which might probably be overflowed, and to say what damage it would be to the several proprietors, and whether the mansion house of any such proprietor, offices, curtileges, or gardens thereunto belonging, or orchards would be overflowed: to enquire whether in their opinion, the health of the neighbors would be materially annoyed by the stagnation of the waters, and the inquest made and sealed by the said jurors, or a majority of them in the premises, he should return together with the

writ, to the County court of said county, at a court to be held for said county at the place of holding the same, on the first Monday in February then next ensuing.

The writ was endorsed as received by the sheriff, on the twenty-second of November, and was returned by him, together with the inquisition annexed.

The inquisition stated that by virtue of the writ, the subscribing freeholders or landholders having appeared in obedience to the summons, at the place mentioned in the writ, were empanneled, sworn and charged by the sheriff, on the day appointed, impartially and to the best of their skill and judgment, to view the land upon which it was proposed by the said William Hendricks, on a creek commonly called Johnson's mill creek, to erect a dam, and build a mill or mills, having due regard to the interest of all persons, and to examine the lands above and below, which were the property of others, which might probably be overflowed, and to say what damage it would be to the other proprietors, and whether the mansion house of any such proprietor, offices, curtileges or gardens thereunto immediately belonging, or orchards, would be overflowed, and to enquire whether in their opinion, the health of the neighbors would be materially annoyed by the stagnation of the waters:—The subscribing freeholders, after a full view, examination and consideration of all matters and things to them thus given in charge, did say and find, that if the said William Hendricks should build a mill or mills, so by him proposed to be built at the site contemplated on the land described in the writ, and there erect a dam eleven feet high, and raise eleven feet head of water in said creek, no mansion house, offices, curtileges, gardens or orchards, would be overflowed or damaged, either above or below said mill site and dam. They further found, that no lands above or below the said mill and dam, the property of others, would be

overflowed or damaged by building said mill or mills, and the erection of said dam, except that it would back the waters one foot five inches above the sheeting or lower part of a dam across the said creek, at a mill said to be Johnson's new mill, and if this were a matter about which they should inquire and act upon, they said, the damage thereby to be done to the said Bernard Johnson, would be nine hundred dollars. They also found that the health of the neighbors would not be materially injured, by reason of building said mill and dam as aforesaid. They further found, that if the said William Hendricks should build the mill or mills by him as aforesaid proposed to be built, at the site aforesaid, and should erect a dam at the said site, nine feet seven inches high, no part or portion of the said mill or mills, or of the property of any person or persons above or below said mill-site and dam, would be overflowed, and that no damage thereby would be done to any person; and as the said William Hendrick, owns the land on both sides of the said creek, at the place and site where he proposed to build said mill or mills and erect the said dam, and the land of no other person for an abutment or ditch, or for any other purpose being wanting in their premises, their duty required of them no assessment of damages on that account. They attached the certificate of the clerk of the county court of said county, stating that there was no mill or mills on said creek established by law, except those established by Andrew Smith.

The inquisition was signed and sealed by the freeholders on the thirtieth day of November, eighteen hundred and thirty-three, and to it was appended the certificate of the clerk of the County court as therein set forth.

And at the February term of the County court, eighteen hundred and thirty-four, an order was made in the cause, then entitled *ex parte Hendricks—writ ad*

2J

*quod damnum*: on the motion of Hendricks that a summons should issue against Bernard Johnson, returnable to the next term of the court, for him to shew cause why the said Hendricks should not have leave to build said mill and dam, according to his application, at the site proposed—which summons accordingly issued returnable to the August term of said court, and was served on Johnson.

And at the said August term of said court, a motion was made by counsel as *amicus curiæ*, to quash the writ of *ad quod damnum*, because the place where the said mill or mills were to be erected, was not described with sufficient certainty therein,—on which motion, no action of the court appears to have been had. Johnson then appeared in proper person, and filed a plea in abatement to the writ of *ad quod damnum,* which was demurred to by Hendricks, and the case was continued.

The plea in abatement disclosed the fact, that when the writ was issued, it was blank as to the time when it was to be executed, but was afterwards filled up with the twenty-ninth November, before its execution.

And at the February term, eighteen hundred and thirty-five, the demurrer was overruled. Hendricks then moved the court to set aside so much of the inquest, as related to the assessment of damages in favor of Johnson, and that the residue thereof should be confirmed, and leave given to him to erect a mill or mills, and a dam *nine feet* seven inches high. Johnson resisted this motion on the following grounds:

1. Because the writ of *ad quod damnum* was issued with a blank, as to the day when the same should be executed by the sheriff;

2. Because the jury of inquest estimated the damages which the said Johnson would sustain by the erection of the mill and dam of Hendricks, too low ;

3. Because the jury was grossly mistaken in their estimate of the backing of the water, from the erection of the dam by Hendricks;

4. Because the said Johnson had a saw-mill a short distance above the cite of Hendrick, and that he acquired title to the land on which it was erected, before Hendricks did to the land on which his site was situate, and in relation to which the inquest was had;

5. Because he was prior in point of time in commencing the erection of his mill, and in appropriating the water of the stream to his own use;

6. Because he sued out the first valid and legal writ of *ad quod damnum* for the examination of his mill site, and in order to obtain leave to erect his mill and dam;

7. Because he was the owner of another grist-mill and saw-mill on the same stream, on which the dam erected by Hendricks would cause the water to re-flow to his great injury, for which no damages were expressed by the jury of inquest.

After the examination of much evidence in the case, it was considered by the court, that on Hendricks' paying to Johnson nine hundred dollars damages assessed by the jury of inquest, he should have leave to erect said mill or mills, and have leave to erect a dam nine feet seven inches high, to propel the machinery of said mill or mills, and that each party should pay their own costs.

Both parties were dissatisfied with the judgment of the court, and appeals were thereupon taken to the Circuit court.

And at the Spring term of the Circuit court, eighteen hundred and thirty-five, Hendricks assigned for error, as follows:

1. That the County court rejected certain evidence as disclosed by the record;

2. That evidence was admitted improperly, which was excepted to;

3. That damages were allowed to Johnson;

4. That the damages allowed to Johnson were excessive, and not warranted by the evidence.

Johnson assigned for error:

1. That the County court erred in sustaining the demurrer to the plea in abatement;

2. In rejecting any part of the evidence of the witness Ritchy;

3. In granting leave to erect said mill and dam:—Because the writ issued in blank, and was void:—Because the assessment of damages was too low, and because the jury of inquest was mistaken in their estimates of back water;

4. Because the land on which Johnson's new mill was erected, was acquired by him from the United States, before Hendricks acquired his title from the same source;

5. Because he was prior in point of time in commencing the erection of his mill;

6. Because he first appropriated the water of the stream;

7. Because he was first in suing out a legal and valid writ of *ad quod damnum;*

8. Because the jury gave no damages for the injury done to the old mill.

The evidence taken before the County court was as follows:

On the trial of the case, Hendricks offered in evidence, the duplicate receipt of the register of the land office at Cahawba, showing that he had entered and made full payment for the following tracts of land, to wit: the west half of section thirty-three, on the twenty-sixth day of July, eighteen hundred and thirty-three—the north east quarter of the same section, the sixth day of August, in the same year, and the south east quarter of the same section, on the twenty-third day of September, also in the same year,—all in township fifteen, of range nine. He then proved by the county surveyor, that he had surveyed section thirty-three, in the township and range as above, and that Hendricks' mill was upon the said section, and in the county aforesaid.

James M. Lenoir was with the county surveyor, when he surveyed the section. It was on a creek called Johnson's mill creek, below the mill of Johnson on said stream, and the site was near the centre of the section. Both mill and dam were on the south east quarter, though a small portion of one of the mill plates projected upon the south west quarter of the section.

Thomas M. Jackson, said that in the latter part of the summer, or early in the fall of eighteen hundred and thirty-three, Johnson proposed to witness to build a saw mill on the stream, and thinks they examined the site. They agreed to build a mill in co-partnership. Witness had heard of Hendricks' intention of building a mill below, on land recently entered by him —heard it of Johnson. Johnson did not state that Hendricks had told him of his intention of building. Johnson told witness he had intended for two or three years to build a mill, below his old mill on the same stream, and that if Hendricks built, it would prevent him : That there was water enough for two mills, and if another was built he wanted the benefit of it. If Hendricks should build, it would prevent him from building, and for that reason he wanted to build first, if they built only a temporary affair. Johnson desired witness to keep it secret until they should commence building,—this was not for the purpose of deceiving Hendricks. Johnson said Hendricks had taken him in a little,—he (Johnson) had shewn Hendricks the land, who afterwards entered it. Johnson and witness levelled the water between Johnson's old mill and the . proposed site of the new one. Witness thought they might do an excellent business. Johnson directed witness to inform Hendricks of their intention of building, when they got ready to commence, and authorised him to purchase the land of Hendricks. Witness did not measure accurately, but believed at the time, that a dam of eight feet might be made without in-

juring the old mill. Thinks a dam of seven feet three inches would not injure the old mill. The ford across the public road leading from Cahawba to Canton, would be deepened by it. The road crossed at a ford below the old mill, and a bridge had been erected above the road. The bridge had not been received by the Court of Commissioners, nor had the road been turned, (Hendricks offered to prove by the witness that Johnson had erected a mill at the site spoken of, which obstructed the road, and was a nuisance.) Witness further stated, that Johnson's new mill was worth something, even if Hendricks' mill were established, and if it were not established, supposes it worth fifteen hundred dollars. It had three and a half feet live water, that is, water above the common water of the creek. According to his contract, witness went on to erect the mill and dam,—planked the dam seven feet three inches—backed the water on the sheeting of Johnson's old mill—stopped, and planked no higher. Hendrick's dam deepens the ford. Johnson's new mill, with a dam of seven feet three inches, would not stop the old mill—there would then be four feet live water at the new mill. The dam at the new mill deepens the ford of the creek two or two and a half feet. Since Johnson's new mill has been erected, he has seen it at work, and thinks it will cut twelve or fifteen hundred feet a day—the old mill was then at work. The old mill would have cut faster, if the new one had been away. The date of the conversation was eleventh September, eighteen hundred and thirty-three.

James D. Craig, has been for seven years clerk of the County court. Has examined the records of said court, and cannot find that any mill has been established on the creek called Johnson's mill creek, except two of Andrew Smith, neither of which are owned now by Johnson. He saw Johnson's mill seven years ago, and it had then the appearance of an old one.

Hendricks applied to witness for a writ of *ad quod damnum*, for the purpose of having his mill established by the County court, previous to Johnson's application. Hendricks first applied in the last week of September, eighteen hundred and thirty-three for a writ of *ad quod damnum*, which was subsequently quashed—Johnson applied on the ninth of October following. Neither of these writs were prosecuted to effect. When he issued the writ on the first day of October, eighteen hundred and thirty-three, for Hendricks, he left the time blank when the sheriff should empannel the jury—immediately afterwards, on the same day, he issued another writ for Johnson, in which there were no blanks. Hendricks brought back his writ, and requested witness to fill the blank with the twenty-ninth of November, and stated that he had ascertained that Johnson's determination was to empannel the jury on the thirtieth of November, and he wanted his first. Hendrick's writ was prior in point of time.

John Richey, said he had heard Johnson say that he had no order for the erection and establishment of the old mill, which was commenced in eighteen hundred and eighteen, and finished in eighteen hundred and nineteen.

John A. Norwood, crossed at the ford in eighteen hundred and thirty-four, in January, on Johnson's mill creek, where the Cahawba and Canton road crosses said creek. It was then belly deep to a horse—has crossed there some time since, and the water was not so high.

Samuel A. Norwood, said that in February, eighteen hundred and thirty-four, he crossed on the ford at the public road leading from Cahawba to Canton; that the water was three and a half feet deep. Witness went to the miller of Johnson's new mill, and requested him to draw off the water, so that he might pass without injuring the load which he expected to have when he returned. The miller refused to do this, but

said that the water would be drawn off sufficiently by witness' return for him to pass without injury. The back water in the road was produced by Johnson's new mill. Hendricks' mill was not then in operation. Hendricks had not stopped the water at his mill at that time, and but for Johnson's new mill, the water would not have been unusually high—supposes the water might have been between two and three feet at the road, if the new mill had not been there. Witness told Johnson some weeks before he started to North Carolina, that Hendricks said he was going to build a mill below Johnson's old mill. Witness had heard Johnson say several years before, that he intended to build another mill below his old one. Johnson said when witness told him of Hendricks' intention, that he, Johnson, had long intended to build a mill below the old mill, and did not seem to like Hendricks' intention of building.

J. Bruton, drew off the water from Hendricks' mill, and was at work at the mill for Hendricks at the time. The water backed within eighteen or twenty inches of the top of Johnson's mill dam on the shutting of Johnson's old mill. When he let off the water, he took off the plank from the walling of the dam, and the water was ten or twelve feet deep. The creek was a little flush at the time. From the sheeting to the top of the rafters, in Johnson's old mill, is nine or ten feet. At Hendricks', the distance from the sheeting to the rafters, is ten feet and something over. Previous to letting off the water at Hendricks' mill, he had seen at Johnson's old mill, the wheel about two-thirds covered, and supposes Johnson's new mill could not run if there was four feet above the sheeting at Hendricks'.

David Harris. Witness and Hendricks, for whom he was then overseeing, went on the night referred to in Bruton's testimony, to the mill. They awoke Bruton, who drew off the water from Hendricks' mill from two o'clock in the morning till sunrise. They then mea-

sured the water at Johnson's new mill. It was two feet lower in Hendricks' pond than in Johnson's new mill pond. They went to the ford above mentioned—the water was there thirty inches. At Johnson's old mill, the water was twelve inches on the sheeting at that time. The water from Hendricks' mill could not have flooded Johnson's old mill. Hendricks' dam was planked nine feet, and there was one plank off.

Lewis Mosely, crossed at the ford in the week of the County court in February, eighteen hundred and thirty-four—the water in the creek was three feet two inches. If there had been no mill below, the water at the ford would have been twelve or eighteen inches. If the old mill was sawing, it would raise it about two inches,—does not recollect whether there had been rain recently or not.

Jonathan Mosely, crossed at the ford on the fifteenth of February, eighteen hundred and thirty-four—the water in the ford was about his saddle skirts. It was then a dry time.

William Normon, was the mill-wright who built Hendricks' mill. On the twentieth February, eighteen hundred and thirty-four, they stopped the water at Hendricks' mill,—Johnson and others came down to examine Hendricks' dam. The water about the twentieth February, after Johnson's mill had broke, was about thirty inches on the mills below. The creek was swimming that evening. The present site is the only one which Hendricks could have on his land below Johnson's old mill. Witness thinks no mill could be built on Hendricks' land, which would not interfere with Johnson's new mill—thinks ten feet of water at Hendricks' mill would not interfere with Johnson's old mill. A dam of nine feet seven inches will raise the water in the road about fifteen inches. Witness saw Johnson's sheeting when Hendricks had ten feet two inches water, and did not perceive much if any back water on Johnson's sheeting. The fall from Johnson's old mill to Hendricks' mill, is about ten feet two inches—from

Johnson's old mill to Johnson's new mill, is about five feet six inches. The water in Hendricks' pond lacked about eight inches of being up on a level with Johnson's dam at the new mill. The water was then ten feet two inches at Hendricks' dam—he supposes Johnson's new mill will raise the water ·from one to two inches. Thinks it worth about a thousand dollars to build the mill and works at Johnson's new mill. Witness built the mill and dam at Hendricks'—the sheeting is about twelve inches above the natural bottom of the creek. The height of the dam was then from the sheeting to the top of the dam, nine feet seven inches. The back water goes to the mill house, (Johnson's old mill,) but does not get upon the sheeting—that being elevated about eight inches. He believes that back water in that way, will not injure the mill in its works. Witness has followed the business of building mills the last six years. The fall from the new mill to Hendricks' mill is four feet eight inches: from Johnson's old mill to his new mill is five feet six inches. A head of water five feet six inches will back water into the road. The damage to Johnson's new mill, if Hendricks' mill is established, will be its value, and it cost about a thousand dollars. Johnson might sell the running gear and irons for one hundred and twenty-five dollars—the timbers are worth fifty dollars, if Johnson has any use for them. The new mill would be worth more to Johnson than any one else, as by having control of both mills, he could regulate the water.

Willis Nunnalie, says, if he owned Hendricks' mill, he would not take less than twenty-five hundred dollars for it—it ought to be worth five thousand dollars. The value of mills depends very much on the quantity of land attached to them, and the convenience of timber. Johnson has a grist mill in the neighborhood,—Hendricks has one, and Wiley one. There is a want of grist mills in the neighborhood—has heard complaints about the bad grinding at Johnson's,—has heard none about Hendricks'.

William N. Burk is sheriff, and stated that he received a writ of Johnson and Jackson, which was not executed for want of time. He received Hendricks' writ on the twenty-second of November, early in the morning, in which there was a blank—he received one from Johnson on the same day, in which there was no blank. Johnson's writ was delivered to witness before the blank in Hendricks' was filled up by the clerk. Hendricks' writ was delivered about sunrise, and Johnson's about an hour by sun, and the blank in Hendricks' writ was filled about two or three hours after the reception of Johnson's.

John Ritchey. (It appeared that witness was overseer for Johnson, and received as compensation for his services, a part of the crop, together with a portion of the profits of the old mill. It was ruled by the court, that so much of his testimony as went to shew that the establishment of Hendricks' mill would effect Johnson's old mill, was inadmissible.) The witness stated that Johnson's new mill commenced sawing on the twenty-ninth of December, eighteen hundred and thirty-three, —Jackson commenced building it on the first day of October, eighteen hundred and thirty-three. About ten days afterwards, witness was at Hendricks' mill site— there were then only some brush and some mill timbers, which appeared fresh. Witness and others had made two admeasurements of the water, and its effects at the several mills—the first day of August, eighteen hundred and thirty-four; and the twenty-second February, eighteen hundred and thirty-five. In the first admeasurement, Hendricks' dam was the rise of ten feet high, and had nine feet head of water—the mill was sawing. Johnson's new mill was entirely drowned, and the gates up—the water at which was level, and running over —the water was four feet deep, and five feet ten inches on the sheeting of the new mill—the new dam entirely covered. They then went to the old mill, which was stopped and not running—left the gates of the new mill up—the water was not then on the sheeting of the old

mill—it lacked two and a fourth inches. It is twelve inches from the sheeting to the bottom of the creek— the back water came up from the dam of the old mill. From the ford spoken of to the dam of the old mill, is about seventy yards, and there is but little fall from the sheeting of the old mill to the ford. The last admeasurement was on Sunday—the reason of making it on Sunday, was, that all the mills were then shut down. The planking of Hendricks' dam was lower from eight to thirteen inches than in August. In August, the rafters at Hendricks' mill lacked seventeen inches of being planked out,—on the Sunday in February, they lacked twenty-four inches, and in some places, twenty-eight inches. Commenced the examination at Johnson's old mill. The gates of the new mill were up—the water then one and a fourth inches higher in the new dam than below. At the old mill, the water was six and a half inches on the sheeting of the wheel. The last admeasurement was the fairest, as the mills were then all stopped. Witness has attended Johnson's old mill nearly four years—he cannot do as good work with six and a half inches on the wheel. It would be difficult to make repairs. Four inches of the new dam was then above water, and no alteration had been made in its height since it started. There was no other cause, as witness could see, to produce the back water, but Hendricks' mill.

So much of the evidence of the witness as went to shew damage sustained by the old mill from Hendricks' mill, was by the court rejected on the ground of interest, as already stated—to which Johnson excepted.

James Lenoir, was with Ritchey at the measurement on Sunday, the twenty-second of February, as stated above, and in his testimony confirmed the statement made by Ritchey.

Aiken Brazile, examined the water last Sunday evening at sunset—it was six and a half inches on the sheeting of Johnson's old mill. Examined Hendricks' mill in August last,—nine feet seven inches would drown

the new mill of Johnson. Is a regular customer of the old mill, and had no cause of complaint. Hendricks' mill did not grind much in low water.

Mr. Welch, in company with others, made an admeasurement on the morning of the trial. Hendricks' dam was ten feet two inches high—the water at Johnson's new dam was four or five inches higher above than below the dam. There was no back water on the sheeting of Johnson's old mill—the water was running rapidly for one hundred and fifty yards below—there was four inches on the sheeting at the old mill, and the water was up to the saddle skirts at the ford.

R. S. Clinton was in company with Welch, and repeats what the witness Welch stated.

The certificate from the register of the land office stated, that Bernard Johnson purchased of the United States, the west half of the north east quarter of section thirty-two, in township fifteen, range nine, on the third day of August, eighteen hundred and thirty one, and that William Hendricks had purchased the west half of section thirty-three, in township fifteen, range nine, on the twenty-sixth day of July in the same year : the north east quarter of the same section, township and range, on the sixth day of August, and the south east quarter of the same section, township and range, on the twenty-third day of September, both in the same year last above mentioned.

To the testimony of the witnesses, was appended a writ of *ad quod damnum*, sued out by William Hendricks, on the first day of October, eighteen hundred and thirty-three, and the inquisition returned in pursuance thereof, which was set aside by the County court at February term, eighteen hundred and thirty-six, because the jury did not view and examine any site for a mill, on the lands described in the writ.

There was also appended a writ of *ad quod damnum,* sued out by Thomas M. Jackson and Bernard Johnson, on the ninth day of October, eighteen hundred and thirty-three,—which does not appear to have been executed.

There was also appended a writ sued out by Ber-·
nard Johnson, on the twenty-second day of November;
eighteen hundred and thirty-three, on which·an inqui-
sition was returned, but no further proceedings had.

An agreement was also set out between· Bernard·
Johnson and Thomas M. Jackson, dated on the eleventh
of September, eighteen hundred. and thirty-three, for
building a saw mill near the line between sections thir-
ty-two and thirty-three; range nine; township fifteen,
on Johnson's mill·creek..

The opinion of· the Circuit court; in pronouncing its
judgment at Spring term, eighteen hundred· and thirty-
six, was given· at length, and stated, that· the clerk of
the County court might lawfully fill up the blank in the·
writ of *ad quod damnum* of Hendricks, after the writ
was delivered to the sheriff, and before its execution, nor·
did the court think it would be void, if inserted by the
sheriff, provided· the clerk authorised him to do so.

In one section of the law relating to mills, it was de-
clared to be unlawful for·any person to erect a mill so as
to overflow any other mill, or create a·nuisance to the
neighborhood. In other sections of' the same law, it
was provided that a jury of inquest should·examine the
lands above and below, belonging to·others, and which·
might probably be overflowed, and· to assess the dama-
ges· to the·proprietors; and further provided; that if on·
such inquests or other evidence, it should appear to the
court that the mansion ·house of any proprietor, or the
offices; curtileges, gardens or orchards thereto belong-
ing, would be overflowed, or the health of the neighbors
materially annoyed—leave should not be granted to
build the mill; but if these injuries· were not likely to
happen, leave should be granted, and any person ag-
grieved· might appeal· to the Superior court; which court
should confirm or reverse the order of the County court;
and give such judgment as might appear reasonable and
right. From the law, it was obvious that the legisla-
ture intended to limit and restrict both the jury of in-
quest and the County court, to certain specified objects.

in their enquiries. By the law, the County court was made competent to receive other evidence, besides what had been received by the inquest, and to establish or set aside the inquest, and to grant or refuse leave to build the mill, as it might be swayed by the evidence; yet the evidence contemplated was circumscribed to the objects specified, to wit, whether the dwelling house or other enumerated appendages would be overflowed, or the health of the neighborhood be annoyed. The law gave no authority to the County court to receive evidence for any other purpose, and though the appellate court was required to confirm or reverse the order of the County court, and to give such judgment as might appear reasonable and right, yet it had no authority to depart from the record, or to be governed by evidence other than that legally received by the County court, for the objects specified and spread upon the record. If that court had received evidence for any other purpose, or to prove any other fact, though spread upon the record, it must be rejected by the Circuit court : Or if that court had rejected material evidence which ought to have been received, the Circuit court, to enable it to do what was reasonable and right, would consider it as now received. By the letter of the law, neither the jury of inquest nor the court, were directed to enquire whether any other mill would be overflowed, and there was no authority to make the enquiry, unless reference was had to the spirit of the law, and to the principles of natural justice, taken in connection with that part of the act which declared it to be unlawful to erect a mill, so as to overflow any other mill.

The court held as a fundamental truth and incontrovertible proposition, that the owner of the soil has an exclusive right to the use of water flowing through his land, if it were not a navigable stream, and that he had a right to appropriate it to any purpose, and to erect upon it any description of water machinery, so long as it produced no private injury, or created no public nuisance. That right to the use of running water was as

indefeasible as the right to the soil.    In both, the owner had a sure property, held by the same tenue, and in many instances the use of the water was more valuable than that of the soil.    The court knew of no principle of justice—no rule of law, or positive enactment, which prohibited the owner of land from erecting a mill or other machinery on his flowing waters, unless he thereby produced a private injury, or caused a public nuisance..    Within these limits, he might lawfully erect as many mills as he chose, and that without the order and judgment of the County court.    With these qualifications, he could not be deprived of his property, or restrained in the use of it, even for public use or benefit, without just compensation.

In that view of the case, the court conceived it would be competent for the jury of inquest as well as the court, in addition to their other duties prescribed by the statute, to enquire whether any other mill would be overflowed.    That had been done by the jury, and from their inquisition, it appeared that by a dam nine feet seven inches high, no injury could result to Johnson's new or lower mill, but that it would be overflowed by a dam eleven feet high, and in which latter event, they had assessed damages against Hendricks at nine hundred dollars.    On the return of the inquisition, the County court granted leave to Hendricks to erect a mill, with a dam nine feet seven inches high, and adjudged that he pay to Johnson the nine hundred dollars assessed as aforesaid.    The court was satisfied that in giving that judgment, the County court in some respects was influenced more by the evidence than by the inquisition. The court had believed from the evidence, that a dam nine feet seven inches high, would overflow, and destroy Johnson's new or lower mill, otherwise one could discover no reason why damages against Hendricks were adjudged to Johnson.    The Circuit court concurred with the court below, that Johnson's mill would be overflowed and destroyed by the erection of Hendricks' dam, but differed from the jury, in believing that the establish-

ment of his mill, under any modification to be useful,
would materially injure, if not destroy Johnson's lower
mill.   He also differed from the County court, in believ-
ing that leave should not have been granted to Hendricks
to erect his dam, in which difference of opinion, he
thought he was well sustained by the testimony.   From
the testimony, it appeared that Johnson became the
owner of the land, and began to erect his new mill be-
fore Hendricks acquired a right to the land below, and
commenced working on his mill.   This he had a right
to do, so long as he created no public nuisance, or in-
jured no prior right of Hendricks, or if he did not divert
the water so as to deprive him of its use below.   If it
were lawful for Johnson to erect his new mill, as the
court presumed it was, then it was unlawful for the
County court, to establish below the mill of Hendricks'
so as to overflow and destroy that of Johnson.   Nor was
it very material, whether the new mill deepened the
water at the ford of the creek or not.   If any, this was
but a slight nuisance, and at least, it did no injury to
Hendricks, and he had no right to complain.   It was
true, Hendricks obtained the first writ of *ad quod dam-*
*num*, but to give him a prior right, he should have been
first, not only in application for the writ, but also in
erecting his mill.   It has been said, if this were the
correct doctrine, then it would not be necessary in any
case to apply to the court for an order to establish a mill.
To this, it might be answered, that where a party wish-
ing to establish a mill was not the owner of both banks
of the stream, or where his dam would overflow the
lands of other persons above, or where a public nui-
sance might be created, or private rights affected, or
where any of those injuries contemplated by the sta-
tute might be produced—in all these cases it was ne-
cessary to obtain the sanction of the court for the es-
tablishment of a mill.   The mill was then under the
protection of the law, and beyond the danger of being
abated as a public nuisance, or being obnoxious to da-
mages for private injury.   From all the premises, it was.

considered by the court, that the judgment of the County court should be in all respects reversed, except as to costs, in relation to which it was confirmed. And inasmuch as the case involved important questions both novel and difficult:—it was ordered, that each party pay his own costs, accruing in the Circuit court.

From this judgment of the Circuit court, the applicant Hendricks, prosecuted his writ of error to the Supreme court, and at the present term, produced his assignment of errors as made below.

*Edwards*, for the plaintiff in error.
*J. B. Clarke*, contra.

GOLDTHWAITE, J.—Before commencing the examination of the questions of law, which arise from the record before us, it becomes necessary to determine in what light we are to view the evidence on which the cause was decided in the County court, and which was certified in the record, and acted on in the Circuit court. The plaintiff in error insists, that the evidence could alone have been spread on the record by bill of exceptions, and as none was taken, it was improperly certified to the appellate court. On the other hand, the defendant in error asserts, the Circuit court to be a forum, in which this cause was or should have been tried *de novo;* and that to spread the evidence of record, a bill of exceptions should there have been taken. Either of these positions sustained, the consideration of the evidence would be wholly excluded from this court, but the effect on the parties would be reversed. In point of law, neither can be sustained. The statute of eighteen hundred and twelve, under which these proceedings originated, in giving the right of appeal, uses phrases which are peculiar. "If, (are its terms) any person shall think himself aggrieved by the determination of the County court, he may appeal therefrom to the next Superior court for the district in which the land lies, which court shall take cognizance of the same, and confirm or re-

verse such order, and give such judgment therein as may appear reasonable and right."

If any one aggrieved by the determination, wishes to take the appeal which is allowed by this act, it must necessarily be taken in term time, when the decision is made; consequently, the court and parties can without difficulty reduce the evidence to writing, and this if certified by the judge, in the absence of all exception, will be presumed to be the whole of the evidence acted on by the County court. Should one party to the case wish to present any matter not in the statement certified by the court, he would present the question by bill of exception, for the consideration of the appellate court.

In no case, however, can a trial *de novo* be had in the Circuit court, unless the statute giving the right of appeal, expressly directs such a course to be pursued. After the removal of the cause by appeal, errors are to be assigned in the same manner as in other cases, and there is no necessity for making as many distinct assignments on the evidence as there are facts involved.

Having thus settled what is before the court for revision, it may be observed, that the investigation in detail of the numerous questions which have been argued, would prevent us from giving to the subject matters of our decision, that connection which is desirable; therefore, we shall first determine the rights of the litigants, as shewn by the facts of the case, and then ascertain if such error exists in the record, as to require the reversal of the judgment of the Circuit court.

The parties are severally the owners of lands in Dallas county, which were purchased by them from the United States a short time before the institution of these proceedings,—Johnson being the first purchaser. A stream of water of such magnitude as to warrant the erection of mills, flows through these lands, but its fall is not great enough within the space owned by both to admit of more than one mill dam. Johnson owns the land which is situated nearest the source of the stream. Both parties have made application to the County court for

leave to build a dam and erect mills, and have sued out writs of *ad quod damnum.* Each one insists that his application was first made, and that thereby he is entitled to a preference. Neither of them was content to await the adjudication of his claim by the County court, but both proceeded and erected dams and mills. The erection of the dam by Hendricks has caused the overflow of Johnson's mill. Johnson urges that he acquired a prior right to the use of the stream, by reason of his being a prior purchaser from the United States; but it is not perceived that this claim is entitled to much weight, as the right to the use of the water of a stream is common to all the owners of the adjacent lands, and is incident to their possession. It is true, that this right may be separated, so that one may be entitled to the exclusive use of the stream, but this can only be the case by the express or implied assent of those interested in the right.

The United States have no other rights within the several states than as a landholder, and when they grant a portion of their domain, only such rights as are incidental to the land pass to the purchaser. No other right is incidental to the land of Johnson than to use the water of the stream in common with all others, and he can claim nothing on this ground.

By the rules of the common law, all proprietors of lands have precisely the same rights to waters flowing through their domains, and one can never be permitted so to use the stream, as to injure or annoy those who are situated on the course of it either above or below him. Should any one interpose an impediment to the flow of the stream to the injury of others, successive actions on the case would in the course of time compel its removal, or induce an accommodation of the injury. But though the rights of all are thus equal and capable of enforcement, the position of him who is nearest the source, is certainly preferable to that of one more distant, for an impediment erected on his portion of the bed of the stream, could only annoy and injure those

above him.   This, however, is a mere relative benefit for each proprietor is affected by it, when his right is considered with reference to another, who is yet lower down on the course of the stream.   Johnson occupying this relative position to Hendricks, as the owner of lands, would be protected by the common law in the use of any dam which he might choose to erect, if in so doing he caused no injury to Hendricks by withholding the water of the stream from him, and this superior right, resulting as before stated, from position merely, could only be divested by a compliance with the requisitions of the statute; but as this is a subject which will be considered hereafter in connection with the construction of the statute, it will not now be further discussed.

The important question in this case, has very properly been stated by counsel, as arising out of the construction of the statute.   If the act of assembly is to be so construed as to prohibit, by implication, the erection of any mill, or if a mill when erected can be destroyed by one claiming a right under the statute, this case would require no further consideration, as it is clear that at the time of the judgment in the County court, Johnson's was not a mill established by law.   But in our opinion, no such construction can obtain.   This, we think, will sufficiently appear from a consideration of the inconvenience which existed at common law in relation to this subject.

It has already been shown that no proprietor could overflow the lands above him by the erection of any impediment in the bed of the stream, without subjecting himself to numerous and oppressive suits, unless he was also the owner or proprietor of all the lands on the course of the stream, affected by the reflux of water from that cause.   Such being the law, it followed that the instances were rare, in which mills could be erected without subjecting their owners to consequences which might prove ruinous, and the statute was evidently enacted to obviate this mischief, existing in the common law.   For this reason, the first act was entitled "an act

6P            ⁓   55

to encourage the building of public mills, and directing the duties of millers." It was enacted as early as eighteen hundred and eleven, by the then Territory of Mississippi.* The general provisions of this act are very similar to those of the statute now in force, which was enacted in eighteen hundred and twelve, and which is only an amendment of the former act. Neither the one nor the other contains any provision by which the person acting under it is directly promised any immunity from prosecution or actions, nor are the rights of any proprietor to the uses of the stream of water directly divested by these enactments. Yet such must have been the intention of those who framed these acts, for otherwise no conceivable object could be attained by them, and no encouragement would be held out to build public mills, according to the title of the act, if those erecting them were to continue subject to the onerous provisions of the common law. It has been held in this court, that an action for overflowing lands would lie against a mill owner, even where the plaintiff had acquired title to lands injured thereby, after the erection of the mill—*Loftin* vs. *McLemore*.†

The checks and restrictions which are imposed on the applicant, directly tend to prove that when the statutes are pursued, the judgment of the court is a complete authority to act as soon as the conditions imposed are complied with.

If, then, these statutes confer and divest rights, it becomes important to ascertain the period of time when they are conferred or divested. In order to this, the statutes must be examined; but before proceeding, it is necessary to determine the extent of the prohibition contained in the fourth section of the act of eighteen hundred and eleven.‡ This section followed others which presented a very similar mode of proceeding to that now in force, and provides that "it shall not be

---

* Laws of Ala. 622.        †2 Stew. 133.        ‡ Ark. Dig. 324, s. 2.

lawful for any person to erect a mill so as to overflow any other mill, or create a nuisance in the neighborhood —*any thing herein contained to the contrary notwithstanding.*" These words, which are italicised, are omitted in Mr. Aiken's digest, but the effect which they must have in restraining any action by the County court, will be apparent from a slight examination. In conferring benefits, or holding out inducements for erecting public mills, it was not to be anticipated that a legislature would authorise a direct and palpable injury to others —they therefore provided, that no action of the County court should authorise the destruction of any other mill, and in all cases where such had been erected, no power was given to interfere with it *by overflowing it*, thus restricting any one who was a proprietor on the stream *below*, from injuring a mill owner *above*, but leaving him entirely to the law as it then stood. If by his erection of the mill, any one had been injured, this right of action was not interfered with, nor was the mill owner protected in any other manner than from intrusion from those below. So likewise, no act of the County court could be allowed to authorise or create a nuisance—such could always be abated *in due course of law.* This section must be construed to have the same controlling operation over the whole act of eighteen hundred and twelve, as it had over the act of eighteen hundred and eleven, and no judgment or decree of the County court can now authorise the overflowing of a mill, or the erection of a public nuisance. Then, to proceed to the construction of the law as it now stands on our statute book, as connected with the inception and completion of the rights to be acquired under it.

The first section provides the manner of proceeding, when "any person *owning lands on one side* of any water course is desirous to build a water grist mill, saw mill, cotton gin, or other useful water works on such lands, and to erect a dam across the same for working said mill, and shall not himself have the fee simple property in the lands on the opposite side thereof, against

which he would abut his dam; or if he should have lands adjoining others through which it may be necessary to dig a ditch or canal in order to erect such mill on his own lands." He is to make application to the clerk of the County court for a writ of *ad qucd damnum*, who is thereupon to issue such process, directed to the sheriff, commanding him to summons and empannel seven freeholders or landholders to meet on the lands so proposed by him for the abutment, ditch or canal, on a certain day to be named by the clerk and inserted in the writ, of which ten days previous notice shall be given by the sheriff to the proprietor: by the second section, is pointed out the duties of the jury of inquest. They are to be charged by the sheriff to view the land so proposed for the abutment, and to locate and circumscribe by certain metes and bounds, one acre thereof, having due regard to the interests of both parties, and to appraise the same according to its true value; to examine the lands above and below, of the property of others which may probably be overflowed, and to say what damage it will be to the several proprietors, and whether the mansion house of any such proprietors, offices, curtileges or gardens thereunto immediately belonging, or orchards, will be overflowed : to enquire whether in their opinion, the health of the neighbors will be materially annoyed by the stagnation of the waters, and if it be a ditch or canal proposed through another's land, then to enquire what damage the same may be to the proprietor, and assess the same accordingly. The third and fourth sections prescribe the manner in which the inquest shall be returned, and how the several persons interested in the land so located or found liable to damage, shall be summoned, to shew cause why the applicant shall not have leave to build the mill and dam; and the fifth section declares that if the person proposing to build such mill and dam *shall have the property in the lands on both sides of the stream*, application shall be made in the same manner for a *like writ*, which shall be directed, executed and returned, as in the former case.

The sixth section then provides, that if on such inquest or other evidence, it shall appear to the court that the mansion house of any proprietor, or the offices, curtileges or gardens thereunto immediately belonging, or orchards, will be overflowed, or that the health of the neighbors will be materially annoyed, *they shall not give leave to build such mill and dam,* but if these injuries are not likely to ensue, *leave shall be given as aforesaid.*

The statute does not contemplate the exercise of any discretion by the court: if the proceedings are regular, and none of the injuries named in the statute are likely to ensue, the application must be granted. The statute does not appear to have provided for the determination of conflicting claims in relation to the appropriation under the statute, of the same water power, and we must therefore determine from the terms used in the several sections, on what conditions the rights are to vest.

The first section is explicit, that any person owning the land on one side, may make the application; and the fifth prescribes, the same form shall be pursued when the applicant is the owner of the lands on both sides. If none of the matters appear by the inquest or other evidence, which authorises the court to decide against the application, the leave must be granted, and as to all other matters, they become questions of compensation, and must be determined as such. From this it results, that the first applicant acquires an inchoate right to the privileges which are conferred by the statute ; and provided he proceeds in the case with reasonable diligence, he is entitled to a decree establishing his mill—if any supposed adverse rights exist, they are such as can be compensated by the damages to be assessed by the jury of inquest, or by the court, on proper evidence. The second section authorises the jury to ascertain the lands above and below, of the property of others which will probably be overflowed, and to say *what damage it will be to the several proprietors.* The next section contemplates that these proprietors may become parties to the case at this stage of it, and if the jury of inquest has

2L

not properly determined the damages, it is a subject which may be corrected by the court on the evidence offered, or it might be made the subject of an issue, and investigated before a jury under the act of eighteen hundred and twenty-one, section six.* And even in cases where the jury of inquest have entirely omitted to name a land proprietor as injured, by reason of which no process would issue, we consider that such an one would be entitled under the equity of the statute, on propounding his interest, to litigate the questions with the applicant, provided it was done at any time previous to the final decree.

But although the application may thus give an inchoate right to him who first applies, it can only be made complete and operative by the judgment rendered in the case—and not even then, unless every condition required by the judgment is complied with. The seventh section of the act, declares "if the party applying obtain leave to build said mill and dam, he shall, upon paying respectively to the several persons entitled to receive the same, the value of the acre so located, and the damages which the jurors find will be done by overflowing the lands above or below, or both by the canal or ditch,—become seized in fee simple of the said acre of land, and as much as may be necessary for such ditch or canal; but if he shall not, within one year thereafter, begin to build the said mill, and finish it within three years," the right to the land shall revert, &c.

The statute, it will be perceived, prescribes no time within which the damages assessed shall be paid; but as we have hitherto determined, in a case between the same parties, at January term, eighteen hundred and thirty seven†—no right is perfect until the judgment is rendered and the damages are paid. If the party applying for leave has, without waiting for the determination of the proper tribunals, proceeded to erect his mills, he

---

* Aik. Dig. 351, s. 27.                  † 5 Porter, 208.

must rely alone on his common law rights; and any one injured by the erection, has all the common law remedies.

The conclusion to which we have arrived, with respect to the potential form of the application, in conferring an inchoate right, requires us to scrutinize the evidence on which the parties severally rely to bring themselves within the description of prior applicants. The clerk of the County court testifies that Hendricks applied for leave in the last week of September, eighteen hundred and thirty-three, and Johnson on the ninth of October following. A writ of *ad quod damnum* was issued in favor of the first, on the first day of October, eighteen hundred and thirty-three, and in favor of Johnson, on the ninth day of October following. These writs were neither of them prosecuted to effect; the inquest returned to the first was quashed, and no return appears in the record to that of Johnson—they may therefore be entirely laid out of view. Other writs were sued out by the parties;—both were issued on the same day, but that of Hendricks first in point of time, in which, however, the time of executing the inquest was left blank. This was afterwards filled up on the same day, and after Johnson's writ had issued, perfect in its form.

From the view we shall take of the record evidence, it will be unnecessary to determine how far parol evidence is admissible, to shew the time at which such an application is made; but as it is clearly so in the case of two records or papers which are *quasi* records made on the same day, we prefer to rest our decision on this point.

The act does not require that any act should be performed by the applicant after making the application. The issuing of the writ is the duty of the clerk, and it cannot be allowed that an error committed by him shall have the effect to prejudice the right of a party. If the writ had have been quashed for the reason that the blank described was in it when issued, yet the fact of his having made the first application, would support any new

writ which might be sued out by him within a reasonable time after the quashing of the first writ.

Another reason which affords a most conclusive answer to this objection, is this: that it was wholly unnecessary to insert any day in the writ for the execution of the inquest, when the application was made by one who was the owner of the lands on both sides of the water course, and the applicant did not seek for the condemnation of lands belonging to another, for an abutment, ditch or canal.  The only reason why, in such cases as seek a condemnation, a day is required to be inserted, is, that the sheriff is required to give the proprietor of the lands sought to be condemned, ten days notice of the time when the inquest is to be made. Hendrick, then, became entitled, by his application, to all the rights which the statute intended to bestow, unless some of the causes were then existing, which are contemplated by the act as reasons for denying the application.   The inquest, when returned, established that no mansion house, &c. would be overflowed, and although no judgment of the County court could authorise him either to overflow another mill, or create a nuisance, yet these matters could also be enquired into by that tribunal, and, if established, would be decisive against the applicant.

The learned judge who decided this case on the Circuit, seems to have considered the evidence as very clearly establishing, that the erection of the dam by Hendricks did overflow a mill erected by Johnson, but did not advert to what is equally clear, that it was begun and erected after the application of the former.   Without entering into the inquiry, how far Johnson, who never attempted to obtain leave for his contemplated erection, could protect himself under the plea that he had *bona fide* begun the erection before any application made by another, we are clear that in the present case, he is without such a defence; for the evidence of two witnesses shews, that his mill was not begun until the day on which the first writ of Hendricks was issued.   If

he afterwards proceeded to defeat the right thus acquired by his opponent, with a knowledge of the application, he is entitled to no commiseration; and if he acted ignorantly, he is without excuse, for the records of his county would always have informed him of the intention of Hendricks to obtain the leave of the proper tribunal to erect his mill and dam. On the other hand, if Hendricks, without the authority of law, has proceeded with an erection which has caused injury to Johnson, the latter has his remedy, but it is not here that relief can be given.

So far as the evidence tends to show any damage to what is termed the old mill of Johnson, we are satisfied that the weight of it is against the position; but should subsequent developements establish the fact, it is one for which there is ample remedy, as no judgment rendered in this case could in any way affect his right to remain undisturbed in that mill.

The objection to the rejection of some part of the evidence given by the witness Ritchey, would be entitled to much weight, if it had in point of fact been rejected, but it all appears in the statement of the evidence set out in the record. It does not appear to have been excluded, nor was the witness rejected. The evidence is before us, and, when considered by the court, is outweighed by that of several other witnesses testifying to the same matters. We have not therefore deemed it important to enquire whether he was so interested as to be an incompetent witness.

The evidence before the County court in reference to the damages sustained by Johnson, was directed solely to the inquiry of the value of the mill. It appears not to have been made a question whether any damage was done to his lands by reason of overflowing them. As the erection of the mill by him was after the application made by Hendricks, it was not a subject matter of compensation under the statute, and no damages should have been allowed to him.

Although from the general principles which we have

laid down, we might now announce our judgment on the whole case, yet we prefer, in order to settle the practice under this statute, to state, that a plea in abatement cannot be sustained to a writ of *ad quod damnum*; it is wholly an *ex parte* proceeding, until the return of the inquest, when any one interested in the subject matter may appear with or without process served on him, and contest the claim. If defects appear in the writ or inquest, they can be reached by a motion to quash the same, which if done, other process could be awarded, and on its return, the cause could proceed to final judgment, when an appeal could be had by any one previously before the court.

It is not conceived necessary to make a particular application of the questions decided, to the several points raised in the assignment of errors in either court; it is sufficient to announce, that all are covered by what has been said.

Our judgment is, that the decree of the Circuit court be reversed, and we proceed to render such decree as we think that court should have done. We reverse the decree of the County court, so far as it adjudges any damages to be paid to Johnson by Hendricks, and in all other matters it is affirmed. The costs of the Circuit court and of this court, are decreed against the defendant in error.